# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs December 18, 2012

## STATE OF TENNESSEE v. JOSHUA TODD CRITTENDEN

### Appeal from the Circuit Court for Blount County
### No. C-19159    David R. Duggan, Judge

_____

### No. E2012-00081-CCA-R3-CD - Filed April 10, 2013

_____

The Defendant, Joshua Todd Crittenden, was convicted by a Blount County Circuit Court jury of two counts of robbery, Class C felonies. *See* T.C.A. § 39-13-401 (2010). He was sentenced as a Range II, multiple offender to consecutive ten-year terms of confinement for an effective twenty-year sentence. On appeal, he contends that the trial court erred by ordering consecutive sentencing. We affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Mack Garner (at trial), District Public Defender, Maryville, Tennessee, and J. Liddell Kirk (on appeal), Knoxville, Tennessee, for the appellant, Joshua Todd Crittenden.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Senior Counsel; Michael L. Flynn, District Attorney General; and Matthew L. Dunn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to the robbery of Lester Robinson and Charles Gillis outside Mr. Robinson's home. At the trial, Lester Robinson testified that he lived at 268 East Edison Street in Alcoa and that he knew the Defendant from "playing dice" in the neighborhood. He said that he saw the Defendant twice on August 3, 2010. He said the Defendant came to his home in a white SUV and asked for change for a $100 bill. He said he was sitting in his carport later that evening around 9:30 p.m. when the Defendant approached him with a shotgun and robbed him and his friend. He said he did not see the Defendant's car, but he

saw the Defendant walk between his and his neighbor's home. He said that the Defendant placed a double barrel sawed-off shotgun to the back of his neck and demanded money, that he complied, and that the Defendant pointed the shotgun at his friend Charles "Petey" Gillis. He said another man, who had a pistol, was with the Defendant. He said that the man pointed the pistol at Mr. Gillis's head and demanded money and that Mr. Gillis complied. He said that his friend "Smitty" was visiting when the Defendant arrived with the shotgun but that the Defendant did not want his money. He said that the Defendant told him not to follow them and that the Defendant and the man left. He said the Defendant took $840 from him.

Mr. Robinson testified that the Defendant wore blue jeans, a blue shirt, and Nike tennis shoes when the Defendant asked for change and that the Defendant wore the same clothing with his shirt turned inside out and two red bandanas when the Defendant returned with the shotgun. He said he saw the Defendant's facial and neck tattoos during the robbery. He identified his cell phone number and said he and the Defendant exchanged cell phone numbers previously. He said he called the Defendant's cell phone after the Defendant left and told him he knew the Defendant robbed him and his friend. He said the Defendant denied robbing them. He said he called the Defendant not long after the robbery and admitted he might have called the Defendant more than once.

Mr. Robinson testified that he wanted to resolve the problem without involving the police, that the Defendant refused to return the money, that the Defendant talked "a lot of smack," and that the Defendant threatened to shoot at his home. He said that the Monday before the robbery, the Defendant called him to find out if he was playing dice that night but that he was unable to play that night. He said approximately $2000 or $3000 exchanged hands during these games. He stated that the Defendant knew he was going to play the night of the robbery, that they were going to play at his home under the carport, and that they were waiting on the Defendant to arrive.

On cross-examination, Mr. Robinson testified that Smitty was not at his home when the Defendant asked for change around 5:30 p.m. He did not recall telling the police that the Defendant arrived in a white SUV around 8:30 p.m. He said the Defendant came by his home around 5:30 or 6:00 p.m. the night of the robbery. He denied gambling often and said he probably gambled two or three times the week of the robbery. He admitted Mr. Gillis and Smitty gambled regularly. He denied socializing with the Defendant outside of gambling.

Mr. Robinson testified that he called the Defendant around 11:34 p.m. the night before the robbery to tell the Defendant that he was not gambling that night. He said that he called the Defendant the morning of the robbery to "get a game started" and that he called the Defendant after the robbery to demand the return of his money. He said the man with the Defendant was smaller and had a darker complexion. He agreed that he called the Defendant

-2-

while he was at the police station and that he told the Defendant he was going to report the robbery unless he returned the money. Although he denied being afraid of the Defendant after the robbery, he said he was afraid when the Defendant placed the shotgun at his neck.

Alcoa Police Lieutenant Paul Gilbert testified that he had known the Defendant since the Defendant was a teenager and that the Defendant was his daughter's friend. He said that on August 5, 2010, he was asked to call the Defendant, that he called the Defendant, and that the Defendant told him he was cheated out of his money at a dice game. He said the Defendant told him that after he was cheated out of his money, he left, returned, and took his money.

Maurice Asbury testified that he was Mr. Robinson's neighbor and lived across the street. He said he knew who the Defendant was but was not well acquainted with him. He said the Defendant drove a tan and white Ford Explorer or Excursion. He said that on August 3, 2010, he saw the Defendant's SUV parked outside Mr. Robinson's home and that he saw the SUV again that night parked on Bell Street with the motor running.

Mr. Asbury testified that he saw two men run between Mr. Robinson's and Ms. Gladys's homes, that he looked away long enough to tell his mother what he saw, and that he saw the men running toward the SUV. He said the men got into the SUV and drove away. He said the men wore masks and carried twelve-gauge shotguns. He said he saw the men pointing the guns at Mr. Robinson's and his friend's heads. He said that he went outside and that it sounded like a robbery. He said that the men were between 5'6" and 5'8" tall and that he saw tattoos. He said he told Mr. Robinson that he thought the Defendant robbed him.

On cross-examination, Mr. Asbury testified that he had known Mr. Robinson for about ten years and denied that he had gambled with him. He said he had seen Charles "Petey" Gillis at Mr. Robinson's home but denied knowing Mr. Gillis. He said that after dark, he saw the Defendant's SUV parked outside Mr. Robinson's home for about one or two hours. He said he saw other cars parked outside Mr. Robinson's home but denied knowing who was there. He said he saw six or seven people rolling dice. He said Mr. Robinson told him that the Defendant was at Mr. Robinson's home gambling. Although he did not recall how much time elapsed between his seeing the men play dice and his seeing the men during the robbery, he estimated it was about one and one-half hours later.

Mr. Asbury testified that he did not call the police because he was told to "stay out of it." He said that people in his neighborhood did not call the police usually and that he did not think Mr. Robinson or Mr. Gillis would call the police. He recalled speaking to a defense investigator and said he did not tell the investigator what he saw because he thought he was

being "hassled" and did not want to testify. He said that he did not see the men get out of the Explorer and that he only saw them run and get into it.

Rodney Rogers testified he was confined to the Blount County Jail on a federal charge and that he had previous convictions for forgery, unlawful possession of a firearm, and possession with the intent to sell cocaine. He said that he met the Defendant in jail. He said the Defendant told him that the Defendant went somewhere and asked for change for a $100 bill. The Defendant told him that he left and that when he returned, he told "them you know what it is." He stated that he told the Defendant that he thought Mr. Gillis was tough and that the Defendant said Mr. Gillis was not tough when he pointed a shotgun at his head.

Mr. Rogers testified that the Defendant told him he wore a mask and that he took money and Mr. Gillis's identification. He denied the Defendant's telling him the amount of money he took. He said the Defendant said he told his mother's "old man," who was a police officer, that he was cheated out of his money. He said the Defendant told him that a woman the Defendant was dating at the time would provide an alibi but that they stopped dating. He said the Defendant attempted to remove his facial tattoos while in jail.

On cross-examination, Mr. Rogers testified that his previous convictions involved crimes of dishonesty and that the pending federal charge involved cocaine. He agreed that he knew Mr. Gillis, that they were in jail together, and that they discussed this case. He said he saw the Defendant with a transcript. He denied seeing the Defendant with other papers and denied reading the transcript. He said he told the police about the Defendant's statements about thirty days after the Defendant arrived. He said he hoped to obtain a letter of recommendation in exchange for his testimony, although he had not been promised a letter. He agreed he did not want to talk to counsel or the defense investigator and said he did not want to talk to people about this case in an open area at the jail because the Defendant was a dangerous man.

Alcoa Police Officer Sayeed Rashid testified that the Defendant was his former stepson. He said he did not see the Defendant often while he and the Defendant's mother were married. He said that on August 4, 2010, the Defendant called to ask if there was a warrant for his arrest. He asked the Defendant why he thought an arrest warrant had been issued. He said the Defendant told him that he was shooting dice with a few guys who cheated him out of his money and that he took back the money. He said he told the Defendant that he doubted anyone would confess to illegal gambling by obtaining a warrant for his arrest.

On cross-examination, Officer Rashid testified that the Defendant confessed to participating in illegal gambling and that he did not investigate whether an arrest warrant existed. He did not recall whether he told the Defendant to contact Officer Gilbert. He did not know what occurred at Mr. Robinson's home.

Charles R. "Petey" Gillis, III, testified that he had known Mr. Robinson for more than ten years and that they played cards and dice, sometimes three times per week. He said he knew the Defendant from playing dice, although he did not recall the Defendant's playing. He said that on August 3, 2010, he was at Mr. Robinson's home sitting at a table in the carport when the Defendant arrived in a white truck. The Defendant asked if anyone had change for $100 bill. He stated that he gave the Defendant change, that they talked for a couple of minutes, and that the Defendant left. He said he had about $2500 that night, of which the Defendant saw about $2000.

Mr. Gillis testified that the Defendant returned later while he sat at the table in the carport with Mr. Robinson and Smitty. He did not recall Smitty being at the home when the Defendant arrived the first time. When the Defendant arrived the second time, he came from between Mr. Robinson's and the neighbor's home and carried a shotgun. A second man walked to the table, and both men wore bandanas around their faces. He said the Defendant wore a red "hoody" and an inside-out shirt underneath. He said the Defendant wore a "South shirt" the first time he came to Mr. Robinson's home.

Mr. Gillis testified that Mr. Robinson was sitting when the Defendant approached and placed a shotgun to Mr. Robinson's neck. Mr. Gillis said he stood up, and the other man pointed a pistol at his neck. He stated that the Defendant told them to give up the money, that the Defendant took Mr. Robinson's money, and that the other man took money from his pants pockets. He said the men took about $1000 from his front pockets and the remainder of his money from his back pants pocket. He said he was scared and nervous because the other man had the hammer pulled back on the revolver.

Mr. Gillis said that Smitty was sitting at the table, that Smitty reached into his pants pocket and placed his money on the table, and that the Defendant told Smitty that he did not want his money. He said the Defendant addressed Smitty by name. He said the Defendant pointed the shotgun at his stomach and neck. He said that he feared for his life and that he knew it was the Defendant because of his tattoos.

Mr. Gillis testified that he did not contact the police immediately after the robbery because they wanted to get their money from the Defendant without having the Defendant arrested. He said that Mr. Robinson called the Defendant that night and that the Defendant denied involvement in the robbery. He stated that he talked to the Defendant later that night,

that the Defendant continued to deny involvement, and that the Defendant threatened his girlfriend. He said he spoke with the Defendant on the phone the next day while he and Mr. Robinson were at the police station. He said that the Defendant threatened him and said he would "take care of" him and Mr. Robinson. The Defendant claimed to know where Mr. Gillis and his girlfriend lived. He said the Defendant took his driver's license during the robbery. He said he identified the Defendant in a photograph lineup.

On cross-examination, Mr. Gillis testified that he had known the Defendant a few days at the time of the robbery and denied telling a police officer that he had known the Defendant for several months. He agreed he saw the Defendant once before he asked for change the day of the robbery. He stated that the Defendant came to Mr. Robinson's home asking for change around 8:00 or 8:30 p.m. and that he did not recall if Smitty was there. He denied that they played dice that night. He said that about one hour later, the Defendant and another man arrived with guns. He stated that although he was afraid for his life when the gun was pointed at him, he was not afraid to call the Defendant to demand the return of his money.

Verizon Wireless employee Patrice McKnight testified that she received a subpoena for a cell phone number registered to Marilyn Rashid. She said that at 9:42 p.m. on August 3, 2010, the cell phone received a call and that the phone used tower 330 during the call. She said that tower 330 was located at 217 Hannum Street in Alcoa, Tennessee, and that the cell phone was two to three miles from the tower at the time it received the call. On cross-examination, Ms. McKnight identified multiple incoming phone calls and said the cell phone used tower 330. She said that Verizon Wireless did not monitor the content of the conversations and that she did not know who answered the incoming calls.

Alcoa Police Detective Kris Sanders testified that he investigated this case after Mr. Robinson and Mr. Gillis talked to him about a robbery. He said that Lieutenant Gilbert told him he spoke to the Defendant and that he asked Lieutenant Gilbert to tell the Defendant to call him. He said that the Defendant called him and that the Defendant claimed he was being accused of robbery. He said the Defendant told him, "a dice game had been robbed in the hood and that some old heads were pointing the finger at him." He said the Defendant asked if there was a warrant for his arrest. He said the Defendant told him that he was in Knoxville with his girlfriend at the time of the robbery. He said that the Defendant's girlfriend, Vanessa Perry, came to the phone and that she provided her cell phone number. He said he wanted to talk to her when the Defendant was not present.

Detective Sanders testified that the Defendant called later that afternoon and left a message stating that the Defendant was not comfortable talking to him about the case and that he would talk to Officer Rashid and Lieutenant Gilbert because he trusted them. He said he returned the Defendant's call, who admitted attending a dice game in the area two weeks

before the robbery occurred. The Defendant admitted arguing with Mr. Gillis about "cheating on a roll." He said the Defendant stated that the Defendant took his money and left the game. He said the Defendant also described this as a misunderstanding and unwanted trouble. He said the Defendant told him that he was at his girlfriend's house from 7:30 to 10:20 p.m. the night of the robbery and that his girlfriend's mother made meatloaf for them that night. The Defendant told him that whatever occurred that night, it was not a drug-related robbery.

Detective Sanders testified that he next spoke to the Defendant on August 6 around 2:30 a.m. The Defendant said he heard the police were looking for him and wanted to know what was happening. The Defendant's call woke Detective Sanders, who told the Defendant he would call the Defendant later that day. He said warrants were issued for the Defendant's arrest. He told the Defendant there were warrants for his arrest and asked him to surrender to the police. He said the Defendant said something and hung up.

Detective Sanders testified that the Defendant received a telephone call at 9:42 p.m. and that the Defendant's phone used tower 330 located two miles from Mr. Robinson's home. He said the Defendant's phone used tower 330 at 7:43, 8:24, 8:31, 9:32, 9:36, and 9:37 p.m. He said the Defendant's phone used tower 302 located across from the airport on Alcoa Highway. He said that based on the telephone records, he concluded that the Defendant was in the City of Alcoa at the time of the robbery, rather than Knoxville.

On cross-examination, Detective Sanders testified that the telephone records did not show who placed the calls. He said that he obtained two telephone numbers for Mr. Gillis and that neither number appeared in the telephone records. He said that he wrote a summary of his interview of Mr. Gillis, that the statement in his summary that Mr. Gillis knew the Defendant for "several months" was Detective Sanders's words, and that Mr. Gillis stated that he knew the Defendant "from around the area" in 2010. He agreed Mr. Gillis told him that the Defendant asked for change for a $100 bill twenty minutes before the robbery.

Detective Sanders testified that Mr. Robinson told him that the Defendant arrived and asked for change around 8:30 p.m. and came back an hour later. He did not recall Mr. Robinson's telling him that the Defendant wore a "hoody" during the robbery. He agreed Mr. Robinson did not tell him during the police interview that he attempted to contact the Defendant the morning of the robbery about a dice game.

Robert Paschal testified on behalf of the defense that he was currently serving an eight-year sentence for aggravated robbery and that he had known the Defendant since middle school. He also knew Mr. Robinson and Mr. Gillis from gambling games they hosted and in which the Defendant participated. On August 3, 2010, he saw an argument between

the Defendant, Mr. Robinson, and Mr. Gillis during a dice game. He stated that the Defendant placed a bet with everyone at the table, that the Defendant rolled the dice, and that the men argued about whether the Defendant "hit his point." He said the Defendant said he won the bet, demanded his money, and took the money from the table. He said that Mr. Gillis grabbed the Defendant's shoulder and that the Defendant pushed him away. He stated that Mr. Gillis and the Defendant "had words" and that the Defendant left. He said nobody had weapons that night.

On cross-examination, Mr. Paschal testified that at the time of the robbery, he was on parole, that he was arrested for evading arrest, that his parole was revoked, and that he was scheduled for release in 2012. He agreed that the Defendant wanted him to testify at the preliminary hearing and that he declined because he feared it would interfere with his parole. He agreed that he saw the Defendant in jail after his parole was revoked and that they discussed his case.

Mr. Paschal testified that he reviewed a letter written by the Defendant addressed to the Defendant's mother, that the Defendant referred to someone known as "Squirt," who was the Defendant's sister Megan. He agreed the letter discussed the French Foreign Legion. He said he listened to a recording of a telephone call between the Defendant and the Defendant's sister before his testimony and agreed they discussed Mr. Paschal's failure to testify at the preliminary hearing. He agreed that after listening to the recording, he said, "[T]his s--- is crazy." He denied his response was because the Defendant asked him to "tell stories" on the Defendant's behalf. He said he was about 5'7" tall and agreed he was shorter than the Defendant. On redirect examination, Mr. Paschal stated that neither the Defendant nor the Defendant's family threatened him. He said the prosecutor attempted to persuade him not to testify.

Frank Tiscione testified that he was an investigator for the Blount County Public Defender's Office and that he investigated the street where the robbery occurred. He identified photographs of the area and said Mr. Asbury's home was about 90 to 100 feet from Mr. Robinson's house. He said he could not see the table and chairs on Mr. Robinson's carport from Mr. Asbury's home.

On cross-examination, Mr. Tiscione testified that he went to Mr. Asbury's property one year after the robbery and admitted that he did not know how the property looked at the time of the robbery. He identified a letter from the Defendant addressed to Marilyn Rashid. The letter stated that the Defendant needed to "strategize" and that he needed two witnesses to testify on his behalf. He asked his mother to tell "Little K" that the Defendant needed him to testify that the Defendant was at the dice game, that Mr. Gillis attempted to cheat the

-8-

Defendant out of his money, that the Defendant hit Mr. Gillis in the face, and that the Defendant took the money.

Blount County Sheriff's Investigator Lisa Hoard testified in rebuttal that she was responsible for investigating crimes committed inside the Blount County jail. She said outgoing inmate mail was inspected for contraband and threatening messages. She knew the Defendant and Mr. Paschal and recognized their voices. She identified a September 16, 2010 telephone conversation between the Defendant and Mr. Paschal. The recording was played for the jury but is not included in the record on appeal.

The Defendant was convicted of two counts of robbery. He received consecutive sentences of ten years' confinement for an effective twenty-year sentence. This appeal followed.

The Defendant contends that the trial court improperly imposed consecutive sentencing. He argues that his sentence is excessive and that the State failed to present evidence that he had an extensive criminal history. The State responds that the court properly ordered consecutive sentencing. We agree with the State.

At the sentencing hearing, the presentence report was received as an exhibit. The report showed that the Defendant was charged with aggravated arson after being charged with the instant offenses and that the arson case was pending at the time of sentencing. The report showed a previous conviction for a federal weapons violation. The Defendant was on probation for the weapons offense at the time the instant offenses were committed. The Defendant had previous convictions for disorderly conduct, resisting arrest, possession of cocaine, unlawful possession of a firearm, aggravated assault, escape, violating the open container law, and various traffic violations. The Defendant admitted that he became a member of the Eastside Crips in California while serving his first prison sentence but that he was "inactive" at the time of sentencing. The report showed that the Defendant completed the eleventh grade and that he obtained his GED while serving a federal prison sentence.

The presentence report showed that the Defendant had "good" mental and physical health but that he was diagnosed with attention deficit hyperactivity disorder and bipolar disorder. The Defendant reported that he began using marijuana and drinking at fourteen years old and began using ecstacy at twenty-three. He said he only used ecstacy for about one year. The Defendant was admitted to Peninsula Mental Health Center in September 1996 because of "unruly behavior," anger management, and "life skills." He attended a wilderness program for three months in 1997. A juvenile court placed the Defendant in another wilderness program for six months in 1997, but the Defendant left the program. He completed another program at Lakeshore Mental Health Center in 1998.

The presentence report showed that the Defendant's employment history was limited because of the Defendant's prison confinement. The Defendant reported having three jobs, with the longest being for about three months.

Alcoa Police Lieutenant Joe Thornhill testified that he investigated two cases involving the Defendant in 2003 and 2004. He said that the Defendant was known as a very violent person.

Blount County Sheriff's Investigator Lisa Hoard, an expert in the field of gang identification, testified that she had known the Defendant since 2003 and that the Defendant was an active member of the Kitchen Crips. She said the Kitchen Crips originated from Los Angeles, California, and were active in Knoxville, Tennessee. Photographs of the Defendant's tattoos were admitted as exhibits. She identified tattoos of "Till the Casket Drops," a prison guard tower, and the letters "KCG," which meant Kitchen Crips Gang. She also identified tattoos of "East," "Side," and "Can't stand the heat, stay out of the kitchen." She said the photographs of the tattoos were taken during the Defendant's various arrests. She said that tattoos were used to intimidate, that the Defendant had a progression of tattoos, and that the more recent tattoos were more prominent. She identified tattoos on the Defendant's hands that read "high risk." She concluded that the Defendant was an active gang member.

Investigator Hoard testified that she became familiar with the Defendant's handwriting by examining the Defendant's mail. She identified a January 27, 2011 letter addressed to Jessica McCurry and said the Defendant wrote the letter. It stated, "I would have been out of here if Rob P. and Darius Y. would have come to court and testified on my behalf. But instead they didn't come and help me 'cause they let those two old dudes from the dice game come to court and lie on me." She agreed the letter could have been an intimidation tactic.

Investigator Hoard identified a November 28, 2010 letter addressed to the Defendant's mother stating that the Defendant needed two witnesses to testify at the trial. In the letter, the Defendant asked his mother to tell Little K that the Defendant needed him to testify that Little K was at the dice game, that Mr. Gillis attempted to cheat the Defendant, that the Defendant hit Mr. Gillis, and that the Defendant took the money from the table. Investigator Hoard agreed the Defendant attempted to solicit favorable testimony from Little K. She said the Defendant had been the primary aggressor in several fights while in confinement. On cross-examination, Investigator Hoard stated that the Defendant had been housed in general population for several months.

-10-

Maryville Police Officer Ryan Rogers testified that he had known the Defendant since 1998 and that he met the Defendant during an investigation. He said that the Defendant had a reputation for associating with violent people and that the Defendant was a violent person.

Alcoa Police Detective Kris Sanders testified similarly to his trial testimony regarding his investigation and the events leading to the Defendant's arrest. He stated that the Defendant first denied involvement in the robbery, that he attempted to establish an alibi, and that he changed his story to that of people blaming him for the robbery of a dice game. He said the Defendant was known as a dangerous person and as a predator of the Hall Community in East Maryville.

On cross-examination, Detective Sanders testified that the victims told him they saw a third person who did not approach Mr. Robinson's home during the robbery. He agreed that the Defendant denied robbing the victims and denied carrying a firearm. He agreed the Defendant was acquitted of unlawful possession of a firearm and convicted of robbery, a lesser included offense of aggravated robbery. He agreed the man who allegedly held the pistol during the robbery and the third man who did not approach Mr. Robinson's home had not been arrested.

The Defendant testified that he was previously convicted of three felonies. He admitted making mistakes when he was younger and said he was charged with assaulting an officer when he escaped from juvenile detention. He said he simply moved the officer out of his way. He said he served three years in confinement. He agreed he was convicted of a federal weapons violation because he was a  convicted felon in possession of a firearm. He said he served thirty-seven months in confinement and three years on probation. He said that after he was released from federal prison, he was ordered to stay in a halfway house, that he left the halfway house without permission because of a family matter, and that he was charged with escape. He said that he served fifteen months of an eighteen-month sentence and that he violated the terms of his supervised release by testing positive for marijuana. He said he returned to prison for six months and was released to probation for two years.

The Defendant testified that he was on probation when the instant offenses occurred. He said that he began gambling after his release in June 2010 and that he knew the victims from previous gambling games. He agreed the instant offenses occurred two months after he was released from confinement. He stated that Mr. Robinson invited him to a dice game, that he went alone, that five or six people were at the game, that he made a bet, that he "hit his point," and that he reached for the money on the table. He said Mr. Gillis disputed the Defendant's making his point and told the Defendant to roll the dice again. He said that he told Mr. Gillis he was wrong and that they both became angry. He said that as he began to take the money, Mr. Gillis removed his money from the table. He said that when he took the

money, Mr. Gillis grabbed his arm, that they "had some words," and that he told Mr. Gillis to let go of his arm. He said he swung at Mr. Gillis because he did not let go. He denied having a firearm or threatening anyone. He said he left Mr. Robinson's home. He denied that another person was involved with his taking the money from the table.

The Defendant testified that later that night, he received threatening telephone calls from Mr. Robsinson and Mr. Gillis. He said they wanted their money and threatened to contact the police if they did not get it. He said he told them that he won the money. He admitted being part of the East Side 87 Kitchen Crip Gang but denied engaging in gang-related criminal activity as a juvenile. He said his involvement was "parties and stuff." He said that he was "made official" when he went to prison as an adult. He denied being involved in gang-related activity since his release from prison.

The Defendant testified that before his arrest on the instant charges, he worked at a barber shop but did not have a barber's license. He said he planned to obtain his barber's license. He told the court that he took what he thought belonged to him, that he took responsibility for his actions, and that he understood his actions were wrong. He denied, though, that he robbed the victims.

On cross-examination, the Defendant testified that he was previously convicted of two counts of escape and that he knew he was not allowed to possess a firearm as a convicted felon. He agreed that he held a pencil to a police officer's neck when he escaped from juvenile detention and that his actions led to his aggravated assault conviction. He agreed that he was on bond for an aggravated arson charge at the time the instant offenses occurred. He said he had served six years in prison and that he was twenty-seven years old at the time of sentencing. He agreed he worked for Volunteer Water Service for two months before his arrest on the instant charge. He agreed that his employment with Daily Times lasted thirteen days and ended after he was arrested and that he voluntarily left his employment at Olshan Construction because of "racial issues." He said he made money by working for cash in construction.

In sentencing the Defendant, the trial court considered the evidence presented at the trial and at the sentencing hearing, the presentence report, and the principles of sentencing. The court found that no mitigating factors applied. The court found that enhancement factors (1), (2), (8), and (13) applied. *See* T.C.A. §§ 40-35-114(1) (2010) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"); -114(2) ("The defendant was the leader in the commission of an offense involving two (2) or more criminal actors"); -114(8) ("The defendant, before trial or sentencing, failed to comply with the conditions of a sentence

involving release into the community"); and -114(13) (At the time the felony was committed, the defendant was released on parole or probation).

The trial court discredited the Defendant's testimony that he did not rob the victims and found that the Defendant failed to take responsibility for his previous convictions. The court found that the Defendant made his gang affiliation sound like a social club and discredited his testimony that he had not engaged in gang activity since his release from prison. The court found that the Defendant lacked the potential for rehabilitation because of the multiple times he received and violated probation by committing criminal offenses. The court also found that the interest in protecting society from the Defendant's criminal conduct was great and that the Defendant had an extensive history of criminal conduct.

The trial court sentenced the Defendant as a Range II, multiple offender to ten years' confinement for each robbery conviction. The court ordered consecutive sentencing because of the Defendant's extensive criminal activity and his being on probation for another offense.

The determination of concurrent or consecutive sentences is a matter left to the discretion of the trial court and should not be disturbed on appeal absent an abuse of discretion. *State v. Blouvet*, 965 S.W.2d 489, 495 (Tenn. Crim. App. 1997). Consecutive sentencing is guided by Tennessee Code Annotated section 40-35-115(b) (2010), which states, in pertinent part, that the court may order sentences to run consecutively if it finds by a preponderance of the evidence that:

(2) The defendant is an offender whose record of criminal activity is extensive; [or]

. . .

(6) The defendant is sentenced for an offense committed while on probation[.]

"These criteria are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing." *State v. Mickens*, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003).

We conclude that the record supports consecutive sentencing. The Defendant admitted that he served six years in confinement before the instant offenses, that he was twenty-seven years old at the time of sentencing, and that he had numerous previous convictions. The Defendant had an extensive history of criminal conduct, and he was on probation at the time the instant offenses were committed. The Defendant is not entitled to relief.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE